**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

ROBERT DARIUS SPENCER,

Petitioner,

v.

ROBERT MILLER,[1]

Respondent.

Case No. 23-CV-820-JPS

**ORDER**

## 1. INTRODUCTION

On June 20, 2023, Petitioner Robert Darius Spencer ("Spencer"), proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Magistrate Judge Duffin screened the petition and ordered Respondent to file either a motion to dismiss or answer the petition. ECF No. 4 at 2. Spencer's case was then reassigned to this branch of the Court for further disposition. July 10, 2023 docket entry. Respondent submitted a response. ECF No. 9.

In September 2023, Spencer moved to stay these proceedings so that he could exhaust an additional claim of ineffective assistance of appellate counsel. ECF No. 10. In March 2024, the Court denied Spencer's motion to stay and directed Spencer to either to dismiss the case without prejudice so that he could exhaust the additional claim or to abandon the unexhausted claim. ECF No. 15. Spencer moved for reconsideration of this decision, ECF

[1]Robert Miller ("Respondent") is the current Warden of Racine Correctional Institution, where Spencer is in custody. Warden Miller is therefore automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d). The Clerk of Court is directed to update the docket accordingly.

No. 16, which the Court denied, ECF No. 18. Spencer then indicated that he would abandon the unexhausted claim and requested extensions to file a brief in support of his petition. ECF Nos. 16, 18–21. Counsel then appeared for Spencer, ECF No. 22, and submitted a brief in support of his petition, ECF No. 25.

Spencer's petition for a writ of habeas corpus has now been fully briefed.[2] For the reasons explained below, the Court will deny the petition and grant a certificate of appealability.

## 2. RELEVANT BACKGROUND

Spencer moves to vacate his conviction and sentence in *State of Wisconsin v. Spencer*, Case No. 2014CF005088 (Milwaukee Cnty. Cir. Ct. 2014), *available at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2014 CF005088&countyNo=40&index=0&mode=details (last visited Sept. 29, 2026).[3] After a five-day trial, a jury found Spencer guilty of felony murder and possessing a firearm while being a felon. ECF No. 1 at 2. The trial court sentenced Spencer to a global sentence of thirty-eight years. *Id.*

### 2.1 Spencer's Trial

At trial, the State presented a theory that Spencer, armed with a firearm, and an accomplice ("T.M."), robbed a mutual friend ("R.S.") over a debt D.R. owed to Spencer, outside of R.S.'s residence. ECF No. 9-6 ¶¶ 6, 8; ECF No. 9-3 ¶ 4. R.S. fled, and Spencer shot towards R.S. *Id.* A second

[2]Respondent submitted a brief in opposition to Spencer's petition, ECF No. 30, and nearly one year later Spencer moved for an order accepting the late filing of his reply brief, which was granted. ECF Nos. 31, 32.

[3]The Court draws these facts from the petition, ECF No. 1, the relevant Supreme Court of Wisconsin decision, ECF No. 9-6, and excerpts of Spencer's trial transcripts, ECF No. 9-12. For brevity, citations to the record will be omitted from the analysis.

person with a firearm located inside R.S.'s residence, identified at trial as Danny McKinney, "began to return fire to protect R.S." ECF No. 9-6 ¶¶ 6 (internal quotations omitted), 8, 11. This "exchange of gunfire" killed Spencer's accomplice, T.M. ECF No. 9-6 ¶ 6.

A tow truck driver who witnessed the robbery, Lerone Towns, testified at trial. *Id.* ¶ 7. The evening of the robbery and shooting, R.S. had arranged for Towns to tow a vehicle to his residence. *Id.* While R.S. went inside to get money to pay and Towns completed paperwork, Towns heard a commotion and saw two men with R.S. *Id.* Towns testified that one of the men pulled out a gun and dragged R.S. in front of the residence, and then there was gunfire. *Id.* Towns left the scene while still towing the vehicle, then received a call from R.S. to meet at another location "where R.S. arrived with the individual identified as Mr. Green to pick [the vehicle] up." *Id.*

R.S. previously identified the armed man with T.M. as Spencer, but at trial, R.S. testified inconsistently with two previous interviews and insisted that he did not recognize the armed man with T.M. *Id.* ¶¶ 11–12. Trial testimony established that R.S. lived with McKinney, ECF No. 9-10 at 27; ECF No. 28-1 at 82; and R.S. believed McKinney was in the residence at the time he arrived with the tow truck, ECF No. 9-10 at 29; and that detectives believed shots were fired from the kitchen window of the residence. ECF No. 28-1 at 82; ECF No. 9-9 at 29. Petitioner alleges here that R.S.'s testifying about statements made by McKinney about his motive for shooting are inadmissible hearsay. R.S. testified that he lived with Danny McKinney and Mr. Green, and McKinney was present in the upper unit of the residence during this event. 9-6 ¶ 8. R.S. testified that "Danny told [R.S.] afterward he 'was firing from the residence in an attempt to protect [R.S.].'" *Id.* ¶ 11; ECF No. 1-1 at 3–4. Spencer's counsel did not object to this

testimony. *See* ECF No. 9-6 ¶ 17. (On appeal, Spencer argued that trial counsel was ineffective for failing to object to this testimony as hearsay. *Id.*)

R.S. testified that the two individuals dragged him towards a gold minivan. *Id.* ¶ 9. "The investigation revealed Spencer's fingerprints on the van, and a traffic citation and receipt in Spencer's name were found inside the van. Forensic evidence demonstrated one of the shooters shot from the residence and the other shooter was near the gold mini-van, in the area where T.M.'s body had been found." *Id.* The van's license plate was registered to Justin Gray; fingerprints on the van were traced to Mr. Gray and another individual, and DNA recovered from a bottle at the scene was traced to Mr. Green-Brown. *Id.*

No other eyewitnesses testified. T.M.'s sister ("K.G.") testified that she had eaten dinner with Spencer and T.M. hours before the robbery, and Spencer and T.M. left together in the gold van. ECF No. 9-6 ¶¶ 44. R.S. also told "one of [his] girlfriends it was a person by the name of Spencer, who may be involved but not actually with a gun." *Id.* T.M.'s other sister ("Q.G.") also testified that R.S. "told her after the incident—but before speaking to detectives—that [Spencer] was responsible." *Id.*; ECF No. 9-11 at 5.

After the close of evidence but before closing arguments, the parties were discussing jury instructions and then took a recess. ECF No. 9-12 at 18–19; ECF No. 1-1 at 7. The precise sequence of events is not entirely clear from the record; therefore, the Court reproduces below the entirety of the transcript related to this incident:

(Whereupon, a 45-minute recess was taken.)

**THE COURT:** The record should reflect it is now almost five after 10. It's been over a half an hour at least, maybe 45 minutes, since we went off the record earlier. The Court went off the record because I was advised that we had a juror

who was not feeling well. And when I inquired and with the assistance of one of the bailiffs, we had the juror come out of the jury room, go into my chambers where there's a quiet place for her to rest to see whether she would be feeling better.

She is not feeling well enough to proceed. And when I asked her about 15, 20 minutes ago if she thought she would feel well enough to proceed in any particular length of time, her answer was very tentative and she said unlikely basically and she didn't know how long she would need before she could participate. She is, if you want to know the details, queasy, light headed, just unwell generally.

I did inquire. She said she's been having some health issues as of late and believes that these are -- her words -- "the reminisce" of some health issues that have been going on I think last week.

I conferred with the attorneys. We met in the back. I advised the attorneys going along what was the cause for the delay and what was being done to assist the juror and we agreed to wait and we've now waited a significant period of time. And I have to be mindful that we have the remaining 12 sitting back in the jury room waiting to move forward.

I understand the significance of this for both sides, frankly. This is the only African-American juror on the panel. But I am not prepared to put her health at risk by having her continue and go to deliberations when she is so unwell. *After we met*, the defense asked a question for purposes of the record which I do not find inappropriate. *I did ask -- I inquired along the lines of the concern that the defense had*. I asked the juror if her stress or her not being well enough to proceed had anything to do with her service as a juror or with the behavior of any of the other jurors. Her response to me was "Oh, no. This has nothing to do with the trial." So I'm satisfied with that response. I've made my record.

[State Counsel], I'll hear from you if there's a request or anything further that you'd like to put on the record. *At this point I will tell you I have resolved that we will go forward with the 12.* I understand that each of you -- one of you might have some motions to bring and I'll allow you to state your positions succinctly for the record but I'll ask you to be succinct. Thank you. [State Counsel].

**STATE COUNSEL:** First of all, I would just say I agree with everything the Court said as to the recitation of what the Court had told us prior to this. I would simply indicate, Your Honor, that I do agree that based on health issues that she should be struck for cause. I think it would be very --

**THE COURT:** She's excused is what we're going to say.

**STATE COUNSEL:** The only reason I was going to say "for cause" is because I do know that the statutes do say that alternates can only be picked at random. So we can't designate her as an alternate per statute but we can excuse her for a good reason.

**THE COURT:** For cause.

**STATE COUNSEL:** Yeah, for cause. And the only reason I'm saying that is because that is allowed. So I agree with the Court's resolution or determination.

**THE COURT:** All right.

**THE COURT:** [Defense Counsel], I'll allow you to make your record.

**DEFENSE COUNSEL:** Succinctly.

**THE COURT:** Turn the microphone on though, please.

**DEFENSE COUNSEL:** At the outset of this trial when the panel was impaneled and after the composition of the potential jurors was revealed, I expressed to the Court concern about the underrepresentation of minorities at that point in the room. The following morning I brought a Swain challenge based on the pool of people that is

from the Department of Transportation's photo ID and state ID records and that it underrepresented African-Americans. The Court denied the challenge, ruling that I had not met my burden of proof. We're now in a situation where we have no African-American jurors. And in a trial where the defendant is African-American, I inquired specifically of -- I believe she was Juror No. 2.

**THE COURT:** Yes.

**DEFENSE COUNSEL:** -- whether or not she would be able to handle the pressure if she were the only African-American juror. I believe what these events demonstrate is not that the juror was not --

**THE COURT:** That the juror was what?

**DEFENSE COUNSEL:** The juror was in any way dishonest with any of us or herself but that there are -- that our bodies are under lots of pressure from lots of things and that this is not unpredictable. I'm moving for a mistrial. I understand the Court is going to deny it but I have to move for a mistrial to protect the record.

**THE COURT:** Yes.

**DEFENSE COUNSEL:** I'm also renewing my challenge under Swain. And finally, the research shows, and I have it in my car, not here in front of me, that even the presence of one African-American on a jury can make a difference in terms of reducing systemic bias. And I'd be happy to get the article to complete the record but I don't have it in front of me. It's in the car with the rest of the stuff. And I would like permission to supplement that just to put it in the record. So I'm moving for a mistrial.

**THE COURT:** Okay. Your motion is noted and it will be denied for the reasons that I've stated. I will add -- and thank you but I'm not gonna allow you to supplement the record at this point with additional research materials. I'm not

saying that they're not valid. I haven't read them. But at this point they're not part of the record and they don't -- they're not part of the Court's decision making process in this.

What I will say for the record is that had this fact pattern been different than what it is, that we may be having a very different discussion. This is not a case where there is an identification that actually took place, No. 1. And No. 2, this is not -- there is not an issue here in terms of any cross-ratio identification or a crime allegedly committed by a person of one race upon the victim of another race, however you want to slice it.

What I think is appropriate to note for the record is that obviously the defendant [Spencer] is African-American given the arguments that have been made, although I don't know that we specifically said that. The defendant is African-American. Detective Graham as he sits here in the courtroom and has sat here throughout the trial is an African-American man. We've heard from Mr. Gary Moore who is a witness, also an African-American man; Anita Cathey, African-American woman; Ms. Davis who gave the offer of proof but did not testify, African-American woman; Kiara Gaines, African-American woman; Lerone Towns, an African-American man; Rashawn Smith, an African-American man; Quintessa Gaines, an African-American woman. These citizens have all testified, and I think it's important to note their race for the record as one as the defense has raised the issue. Sometimes records unfortunately are silent because everybody assumes that they're all sitting here in the trial court. So I will add those facts to the record as the Court has observed them through the course of the trial. And as I indicated, if we had individuals of other races involved as witnesses in this case, we may be having a different conversation. But we don't so I decline to speculate. And thank you, both of you. Your arguments are noted. Your objection is noted. Your motion for mistrial is noted and denied.

ECF No 9-12 at 19–26 (emphasis added). With that background, the Court turns to the postconviction decision, Wisconsin Court of Appeals decision, and Supreme Court of Wisconsin decision.

### 2.2 Trial Court and Court of Appeals Decisions

In a postconviction motion for a new trial, Spencer argued "that trial counsel was ineffective for failing to object to hearsay evidence that was introduced at trial and for failing to object to the court's interaction with a juror without the benefit of counsel," and Spencer asserted that his "Sixth Amendment right to counsel at every critical stage of the proceeding was violated when the court questioned the juror without the parties present." ECF No. 1-1 at 1–2, 6. On the hearsay issue, based on the *Strickland* standard for ineffective assistance of counsel, the trial court concluded that "there was absolute overwhelming evidence of [Spencer's] guilt," therefore counsel's failure to object did not prejudice the outcome. *Id.* at 5–6. On the ex parte communication issue, Spencer argued that counsel should have had an opportunity ask the juror questions about the nature of her illness. ECF No. 1-1 at 6. The trial court noted that it "had asked the juror similar questions and informed the parties of the results of its communication." *Id.* at 7 (citing ECF No. 9-12 at 19–21). The trial court concluded that the communication did not occur at a critical stage in the proceeding, Spencer could not establish that he was prejudiced by his counsel's failure to object to Juror No. 2's dismissal, and if the communication was error, it was harmless. *Id.* at 7–8.

On direct appeal, a divided Wisconsin Court of Appeals panel affirmed in part and reversed in part. ECF No. 9-3 at 1. The court of appeals held that Spencer had pled sufficient facts entitling him to a *Machner* hearing on his claim for ineffective assistance of counsel based on trial

counsel's failure to object to hearsay.[4] *Id.* ¶¶ 24–27. The appeals court found that Spencer had raised a new due process and equal protection clause argument on appeal: "Spencer argues that the trial court's decision to dismiss the juror for cause violated his rights to due process and equal protection and was an erroneous exercise of the trial court's discretion. As the basis for his argument, Spencer points to the trial court's explanation of its decision in which the trial court noted that the juror and many of the trial participants were African-American." *Id.* ¶ 11. The court of appeals considered this due process and equal protection argument forfeited because Spencer raised this line of argument for the first time on appeal, and Spencer had not re-argued his *Swain* objection in his postconviction motion. *See id.* ¶¶ 11–14. The appeals court assumed that the ex parte communication between judge and juror violated Spencer's right to counsel and concluded "that any such violation was harmless." *Id.* ¶ 19.

The dissenting court of appeals opinion concurred with the decision to remand for a *Machner* hearing but would have remanded for a new trial. *Id.* ¶ 30. The dissent found that the ex parte communication "implicate[d] violations of Spencer's due process rights and constitutional rights to assistance of counsel," and did not think Spencer waived or forfeited the due process argument. *See id.* ¶ 30. n.1. The dissent explained four concerns:

[4]Under Wisconsin law, a criminal defendant is entitled to an evidentiary hearing on an ineffective assistance of counsel claim when he "alleges sufficient material facts that, if true, would entitle the defendant to relief." *State v. Ruffin*, 974 N.W.2d 432, ¶ 35 (citing *State v. Allen*, 682 N.W.2d 433, ¶9). The defendant is not entitled to a hearing if the motion "presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *Id.* (citing *State v. Sholar*, 912 N.W.2d 89, ¶50 and *Allen*, 682 N.W.2d at ¶ 14).

first, the record's missing information impaired meaningful review; second, the ex parte communication was not an incidental encounter; third, the ex parte communication was a critical stage of the proceedings; and fourth, the majority incorrectly applied the harmless error standard, specifically by omitting the State's burden to show the error was harmless. *See id.* ¶¶ 36, 45.

### 2.3 Supreme Court of Wisconsin Majority Opinion/Decision

The Supreme Court of Wisconsin accepted Spencer's petition for review, and again the decision was split—this time, affirming the trial court's decision on both grounds. *See generally* ECF No. 9-6.

#### 2.3.1 Spencer was Not Entitled to a *Machner* Hearing for Ineffective Assistance of Counsel for Failing to Object to Hearsay Testimony

The Majority held that Spencer was not entitled to a *Machner* hearing because the record as a whole conclusively demonstrated that Spencer was not entitled to relief. *Id.* ¶¶ 47–50 (citing *State v. Ruffin*, 974 N.W.2d 432, ¶¶ 39–41 (Wis. 2022)). The motion alleged sufficient material facts that would entitle Spencer to relief but failed at the second step in the analysis: "'[E]ven if the motion alleges sufficient facts, an evidentiary hearing is not mandatory if the motion presents only conclusory allegations or if the record as a whole conclusively demonstrates that the defendant is not entitled to relief.'" *Id.* ¶ 49 (quoting *Ruffin*, 974 N.W.2d at ¶ 40). Here, a *Machner* hearing was not mandatory because even if the hearsay testimony was struck, there was not a reasonable probability that Spencer would have been acquitted based on the "absolute overwhelming evidence of his guilt." *Id.* ¶ 50.

Specifically, the Majority cited testimony from witnesses other than R.S. who placed Spencer at the crime scene. *Id.* ¶ 44. R.S. had told a girlfriend that "it was a person by the name of Spencer, who may be involved but not actually with a gun." *Id.* T.M.'s sister testified she had eaten dinner with T.M. and Spencer before the robbery, and T.M. and Spencer had left together in the van found at the crime scene. *See id.* Another of T.M.'s sisters testified that R.S. had told her Spencer was involved. *See id.* ¶¶ 44, 10. Additionally, "[t]he report of gunshots was corroborated by multiple witnesses, ShotSpotter, and forensic evidence, which placed Spencer at the scene through fingerprints lifted from the gold van and a traffic citation and receipt in his name found inside the van." *Id.* ¶ 45.

#### 2.3.2 Spencer Waived a Due Process and Equal Protection Clause Claim Related to the Trial Court Dismissing the Only African-American Juror and Considering the Race of the Trial Participants

On the due process and equal protection claim relating to the juror's dismissal, the Supreme Court of Wisconsin agreed with the court of appeals that Spencer had forfeited this argument by failing to raise it in his postconviction motion. *Id.* ¶ 4 n.4. "At trial, defense counsel moved for a mistrial and renewed a Swain objection, but Spencer's postconviction motion neither mentioned the Swain objection nor argued the juror's dismissal was an erroneous exercise of discretion or a violation of Spencer's due process or equal protection rights." *Id.* (citing *Swain v. Alabama*, 380 U.S. 202 (1965) *overruled by Batson v. Kentucky*, 476 U.S. 79 (1986)).

### 2.3.3 The Ex Parte Communication Was Not a Critical Stage of the Legal Proceedings, So This Interaction Did Not Violate Spencer's Sixth Amendment Rights

On the ex parte communication issue, the Majority concluded that the ex parte meeting was not a critical stage of the legal proceedings at which the right to counsel attached. The United States Supreme Court has explained that "[t]he right to counsel attaches 'at all critical stages of the criminal process.'" *Id.* ¶ 26 (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004) and citing *United States v. Wade*, 388 U.S. 218, 224 (1967)). Critical stages are "proceedings between an individual and agents of the State . . . that amount to trial-like confrontations, at which counsel would help the accused in coping with legal problems or . . . meeting his adversary." *Id.* (quoting *Rothgery v. Gillespie County*, 554 U.S. 191, 212 n.16 (2008)) (internal quotation marks omitted).

In reaching this conclusion, the Majority considered Wisconsin precedent dictating the process for discharging a juror during deliberations, and ex parte communication with jurors during deliberations. *Id.* ¶ 29 (collecting cases). The Majority also looked to *United States v. Shiro*, 679 F.3d 521 (7th Cir. 2012), where a judge communicated with a juror ex parte and then dismissed the juror before deliberations. *Id.* ¶ 30, n. 11 (noting *Shiro* did not consider whether the ex parte communication was a critical stage under the Sixth Amendment). The Majority concluded that the Seventh Circuit found this "meeting was not constitutionally problematic" and any error was harmless, although the judge should have given counsel an opportunity to pose questions to the juror through the judge. *See id.* (citing *Shiro* 679 F.3d at 531).

> Guided by this precedent and having the benefit of a detailed record documenting the judge's communications with the juror as well as counsel, we conclude the judge's meeting with Juror 2 regarding her health did not constitute a critical stage of the proceedings because the meeting (1) occurred prior to deliberations and (2) involved only a discussion of the juror's health and ability to proceed.

*Id.* ¶ 31. "The defense has no constitutional right to be present at every interaction between a judge and a juror." *Id.* ¶ 33 (quoting *Rushen v. Spain*, 464 U.S. 114, 125–26 (1983) (Stevens, J., concurring in judgment))). Further, this meeting "was not an adversarial event." *Id.* ¶ 36 (citing *Schmidt v. Foster*; *United States v. Parent*, 954 F.2d 23, 26 (1st Cir. 1992)). The Majority concluded, therefore, that the ex parte communication about the juror's health was not a critical stage of the proceeding.

#### 2.3.4 Dismissing the Juror Occurred Back on the Record with Counsel Present

The Majority analyzed the trial court's dismissing the juror as "a related but procedurally independent event." *Id.* ¶ 37. The court looked to *State v. Alexander*, 833 N.W.2d 126, ¶ 30 (Wis. 2013), which held that a defendant does not have a right to be present during an in-chambers discussion with jurors about dismissal; "[a]ll that the Constitution requires <u>at such a conference</u> is the presence of defense counsel." *Id.* ¶ 37 (quoting *Alexander*, 833 N.W.2d at ¶ 29, and citing *Ellis v. Oklahoma*, 430 F.2d 1352, 1355 (10th Cir. 1970)) (emphasis supplied by the Majority). The Majority described defense counsel's presence at "such a conference" in Spencer's case:

> Prior to the discussion on the juror's dismissal, the judge was notified that a juror was feeling ill and laying down in the jury room, had Juror 2 moved to her chambers where there was "a quiet place for her to rest," proceeded to check on Juror 2 in her chambers--meanwhile "conferr[ing]" with counsel who "agreed to wait"--and asked a question on behalf of defense

> counsel regarding the nature of the illness. That was the extent of the ex parte meeting. After roughly 45 minutes, the judge went back on the record and documented what transpired during her interaction with Juror 2, stated that she decided to dismiss the juror, and invited counsel to make any motions on the issue. *This decision to dismiss occurred on the record, in the presence of counsel, and with counsel's participation.* That is all the Constitution requires.

*Id.* ¶ 38 (emphasis added).

The Majority also found it meaningful that the trial court "relayed" defense counsel's question to the juror and reported the juror's answer on the record. In at least five places throughout the opinion, the Majority makes this finding about the sequence of events:

> Although counsel was not in the room for the judge's interactions with Juror 2, the judge relayed at least one question from counsel.
>
> [ . . . ]
>
> Counsel could pose questions through the judge . . . . The judge in fact relayed a question from defense counsel concerning the source of the juror's symptoms.
>
> [ . . . ]
>
> At least under the facts of this case, when the juror became ill before deliberations and trial counsel was aware of the meeting, 'agreed to wait,' and had the opportunity to relay questions, the adversarial process would not serve any proper role.
>
> [ . . . ]
>
> Prior to the discussion on the juror's dismissal, the judge was notified that a juror was feeling ill and laying down in the juror room, had Juror 2 moved to her chambers . . .—meanwhile 'confer[ing]' with counsel who 'agreed to wait'—and asked a question on behalf of defense counsel regarding the nature of the illness.
>
> [ . . . ]

> The judge relayed defense counsel's question about whether the illness was related to the trial, and Juror 2 responded no.

*Id.* ¶¶ 15, 35, 36, 38, 41. The Majority emphasized this opportunity for counsel to "relay" questions to the juror throughout its analysis.

#### 2.3.5 The Ex Parte Communication was Harmless Error

Finally, the Majority analyzed the ex parte communication under the harmless error standard. *Id.* ¶ 39. The Majority found that "'a harmless error analysis may apply to certain violations of the Sixth Amendment right to counsel' including 'when the circuit court has had ex parte communications with the jury.'" *Id.* ¶ 39 (citing *State v. Anderson*, 717 N.W.2d 74, ¶ 74 (Wis. 2006) *overruled on other grounds by Alexander*, 833 N.W.2d at ¶¶ 26–29.) A judge's ex parte communication with a juror could be harmless error. *Id.* ¶ 40 (citing *Rushen*, 464 U.S. at 118 and *United States v. Bertoli*, 40 F.3d 1384, 1399 (3d Cir. 1994)). The Majority described the harmless error standard: "An error is harmless if there is no reasonable possibility that the error affected the outcome of the trial." *Id.* ¶ 39 (citing *State v. Koller*, 635 N.W.2d 838, ¶ 62 (Wis. Ct. App. 2001) and *State v. Bjerkaas*, 472 N.W.2d 615, 618 (Ct. App. 1991)).

The Majority defined the specific inquiry as "whether there's any reasonable possibility that counsel's absence during the ex parte discussions affected the outcome of Spencer's trial." *Id.* ¶ 41. To affect the outcome, counsel's presence would need to have altered the juror's retention, and the juror's retention would then need to have impacted the ultimate outcome. *Id.* The Majority found, first, "there is no reason on this record to believe counsel's presence would have had any impact on the juror's ability to proceed"; second, "there was no indication the discharged juror would have voted to acquit Spencer"; and third, the State's case

against Spencer was "overwhelming." *Id.* ¶¶ 41–43. In sum, "there [was] no reasonable possibility that trial counsel's absence during the judge's meeting with Juror 2 affected the outcome of the trial." *Id.* ¶ 46.

### 2.3.6 Dissenting Opinions

Justice Ann Walsh Bradley wrote the Principal Dissent, which was joined by Justices Dallet and Karofsky. *Id.* ¶¶ 53, 86. The Principal Dissent raised two central problems with the Majority's reasoning:

> First, it wrongly separates the [trial] court's communications with the juror from the juror's dismissal, concluding that the communications between the [trial] court and the juror without counsel present did not constitute a critical stage at which the right to counsel attaches. Second, it determines that this constitutional error was harmless by overlooking gaps in the record and ignoring the State's burden to prove beyond a reasonable doubt that the constitutional error was harmless.

*Id.* ¶ 55 (internal citations omitted).

The Principal Dissent began by highlighting that only *after* the trial court had made its record dismissing the juror did she invite "succinct[]" motions. *Id.* ¶ 61. Then, the Principal Dissent contends that "[p]roperly framed, the communications between the court and the ill juror implicated the juror's ability to serve on the jury and participate in deliberations, a consequential event during which Spencer could have benefited from the aid of counsel." *Id.* ¶ 67 (citing *State v. Carter*, 781 N.W.2d 527, ¶18 (Wis. Ct. App. 2010) and *United States v. Ash*, 413 U.S. 300, 313 (1973)). "[T]he [M]ajority paints the communications as a benign interlude with no bearing on Spencer's rights. To the contrary, the judge and juror were not merely discussing the juror's health. They were discussing the juror's health to determine if the juror should be dismissed from finishing the trial and participating in deliberations." *Id.* ¶ 71.

The Principal Dissent also disagreed with the Majority's application of the harmless error standard. *Id.* ¶ 74. In particular, the Majority never noted that the *State* must prove harmless error beyond a reasonable doubt.

> Simply put, the State has failed to meet its burden of proof to show beyond a reasonable doubt that the Sixth Amendment violation did not contribute to the verdict. Neglecting to even mention the State's burden of "beyond a reasonable doubt," the [M]ajority determines that "there is no reason on this record to believe counsel's presence would have had any impact on the juror's ability to proceed."

*Id.* ¶ 77 (quoting *id.* ¶ 41). The Principal Dissent would find the record insufficient to for the state to meet this burden and for the court to meaningfully apply the harmless error standard. *Id.* ¶ 75.

Justice Dallet, joined by Justice Karovsky, separately dissented "to emphasize the importance of a racially diverse juries to enhancing both a jury's performance in criminal trials and the public's perceptions of the fairness of the legal system." *Id.* ¶¶ 87, 93. Justice Dallet highlighted research on the statistical impact of racially diverse juries on improving outcomes and public perception. *Id.* ¶¶ 89, 91.

## 3. LEGAL STANDARD

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (citing *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003)). "Unreasonable means more than incorrect. Rather, the state court's ruling must be 'so lacking in justification that there was an error . . . beyond any possibility of fairminded disagreement.'" *Winfield v. Dorethy*, 956 F.3d 442, 455 n.2 (7th Cir. 2020) (quoting *Burt v. Titlow*, 571 U.S. 12, 19–20 (2013)); *Mays v. Hines*, 592 U.S. 385, 391 (2021) ("The term 'unreasonable' refers not to 'ordinary error' or even to circumstances where the petitioner offers 'a strong case for relief,' but rather to 'extreme malfunctions in the state criminal justice syste[m].'" (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). That is a high standard.

## 4. ANALYSIS

### 4.1 Grounds for Relief Raised By the Parties

In his Petition, which Spencer filed pro se, Spencer raised four grounds for habeas relief. ECF No. 1 at 6–9. First, "[t]he trial court unconstitutionally ex parte commmunicat[ed] with [the] sole African-American Juror and dismissed the juror after the close of evidence." *Id.* at 6. Second, "the defendant[']s constitutional right to due process and equal protection [was] violated when the trial court considered the race of the defendant and of trial participants when" denying his *Swain* objection.[5] *Id.* at 7. Third, "the trial court erroneously exercise[d] its discretion in

[5]Petitioner's sentence ends abruptly after "when." The Court supplies the end of this sentence based on the context from the rest of the Petition and exhibits.

dismissing the juror." *Id.* at 8. And fourth, "trial counsel [was] ineffective for failing to object to hearsay that bore on the causation ele[ment] of felony murder." *Id.* at 9.

Spencer framed the issues differently in his brief in support of the Petition, where he was represented by counsel. ECF No. 25. Spencer framed the issues similarly to his state appeal:

> I. Were Spencer's Sixth Amendment rights violated when the trial court, out of the presence of the Defendant, attorneys and without a court reporter, met with a juror who said she was ill and [then] discharged the juror from serving on the jury[?]
>
> II. Was trial counsel ineffective for not objecting to a hearsay statement of R.S. that Danny McKinney was firing from the Residence in an attempt to protect [R.S.][?]

ECF No. 25 at 1 (capitalization normalized).

Respondent points out that in both the Petition and his briefs, Spencer did not frame his claims precisely under the habeas standard, nor did he cite Supreme Court caselaw in his opening brief. ECF No. 30 at 12–13; *but see* ECF No. 25 at 11 (citing *Cullin v. Pinholster*, 563 U.S. 170, 189 (2011)). Respondent complains that "[c]ounsel's pleading deficiencies leave the Respondent in a tough position" because Respondent must comb through Petitioner's argument and state court authority to "identify the clearly established federal law controlling his claims, concoct an argument on Spencer's behalf, and explain why that argument fails." ECF No. 30 at 13. Respondent urges the Court to "summarily deny Spencer's Petition on that basis alone." *Id.*

It is true that, in his opening brief, Spencer did not acknowledge AEDPA or clearly articulate his claims under the habeas standard. *See generally* ECF No. 25. That said, the Court "retains the independent power

to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (citation omitted); *Monge v. California*, 524 U.S. 721, 739 n.2 (1998) (Scalia, J., dissenting) (citations omitted)); *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) (observing that the Court has "the authority to identify and apply the correct legal standard, whether argued by the parties or not.") (citation omitted); *Seats v. Nurse*, 152 F.4th 874, 882 (7th Cir. 2025) ("A reviewing court retains the right to choose the correct rule to resolve a dispute, . . . but a litigant must be the one to argue why he should prevail." (citation omitted)).

Based on the state courts' decisions, the petition, and the parties briefing, four issues appear suitable for habeas review. First, underlying its analysis, the Supreme Court of Wisconsin determined that the trial court's decision to dismiss the juror occurred in the presence of counsel. Was this a reasonable determination of fact in light of the evidence presented in state court? Second, did the Supreme Court of Wisconsin decide contrary to or unreasonably apply clearly established federal law when it held that the ex parte communication was not a critical stage of the proceeding? Third, did the Supreme Court of Wisconsin decide contrary to or unreasonably apply clearly established federal law when it applied the harmless error standard to the ex parte communication? And fourth, did the Supreme Court of Wisconsin decide contrary to or unreasonably apply clearly established federal law when it held that trial counsel's failure to object to hearsay testimony did not prejudice Spencer?

### 4.2 The Majority Did Not Unreasonably Determine Facts in Light of the Evidence Presented in State Court

The Court begins with two factual determinations underlying the Majority's analysis. The Majority concluded that "defense counsel was present" for the decision to dismiss. ECF No. 9-6 at ¶ 37. The Majority determined that the ex parte communication occurred, and then, during a "related but procedurally independent event," the trial court decided to dismiss the ill juror. *Id.* Spencer did not label this conclusion as a factual finding but did challenge it: "The problem with the analysis of the [M]ajority . . . is that it separates off the record communications between the judge and the juror about the juror's health from their ultimate outcome which is the discharge of the juror." ECF No. 25 at 6; ECF No. 9-6 ¶ 37 n.14. Respondent did not explicitly respond to this point as a factual determination. *See* ECF No. 30 at 19.

#### 4.2.1 The Majority Determined that the Decision to Dismiss Occurred on the Record, in the Presence of Counsel, and With Counsel's Participation

The Court reproduces below a comparison of the trial court's record of the decision to dismiss the juror with the Majority's description of the event, italicizing language that communicates the sequence of the events.[6]

| Trial Court | Majority |
|---|---|
| The record should reflect it is now almost five after 10. It's been over a half an hour at least, maybe 45 | *Prior to the discussion on the juror's dismissal*, the judge was notified that a juror was feeling ill and laying down in the jury room, had |

[6]The Court reproduces these excerpts only in part but acknowledges that a petitioner cannot create an unreasonable determination of fact by isolating phrases from their context. *See Gambaiani v. Greene*, 137 F.4th 627, 633 (7th Cir. 2025)

| | |
|---|---|
| minutes, since we went off the record earlier.<br><br>[…]<br><br>I conferred with the attorneys. We met in the back. I advised the attorneys going along what was the cause for the delay and what was being done to assist the juror and we agreed to wait and *we've now waited a significant period of time*.<br><br>[…]<br><br>I'll hear from you if there's a request or anything further that you'd like to put on the record. *At this point I will tell you* I have resolved that we will go forward with the 12. I understand that each of you -- one of you might have some motions to bring and I'll allow you to state your positions succinctly for the record but I'll ask you to be succinct. Thank you. ECF No. 9-12 at 19–21. | Juror 2 moved to her chambers where there was "a quiet place for her to rest," proceeded to check on Juror 2 in her chambers--*meanwhile* "conferr[ing]" with counsel who "agreed to wait"--and asked a question on behalf of defense counsel regarding the nature of the illness. That was the extent of the ex parte meeting. *After* roughly 45 minutes, the judge went back on the record and documented what transpired during her interaction with Juror 2, *stated that she decided to dismiss the juror*, and invited counsel to make any motions on the issue. ***This decision to dismiss occurred on the record, in the presence of counsel, and with counsel's participation.*** That is all the Constitution requires. ECF No. 9-6 at ¶ 81. |

The Principal Dissent posits that the trial court's decision seems to have already been made when she returns on-the-record. "What is not clear from the transcript is whether the juror had already left the courthouse before the court went back on the record--that is, before counsel even had an opportunity to make or renew any motions." ECF No. 9-6 at ¶ 81. The trial court "made its record" of dismissing the juror, but that record does not convey whether the juror had already been dismissed and left the building by that point.

### 4.2.2 The Majority Determined that the Trial Court "Relayed" Defense Counsel's Question to the Juror

In five places, the Majority describes also trial counsel as "relaying" defense counsel's question to the ill juror. Again, the sequence of events is not clear from the record.

| Trial Court | Majority |
| --- | --- |
| I understand the significance of this for both sides, frankly. This is the only African-American juror on the panel. But I am not prepared to put her health at risk by having her continue and go to deliberations when she is so unwell. After we met, the defense asked a question for purposes of the record which I do not find inappropriate. I did ask -- I inquired along the lines of the concern that the defense had. I asked the juror if her stress or her not being well enough to proceed had anything to do with her service as a juror or with the behavior of any of the other jurors. Her response to me was "Oh, no. This has nothing to do with the trial." So I'm satisfied with that response. I've made my record. ECF No. 9-12 at 20-21. | Although counsel was not in the room for the judge's interactions with Juror 2, the judge relayed at least one question from counsel.<br>[ . . . ]<br>Counsel could pose questions through the judge . . . . The judge in fact relayed a question from defense counsel concerning the source of the juror's symptoms.<br>[ . . . ]<br>At least under the facts of this case, when the juror became ill before deliberations and trial counsel was aware of the meeting, 'agreed to wait,' and had the opportunity to relay questions, the adversarial process would not serve any proper role.<br>[ . . . ]<br>Prior to the discussion on the juror's dismissal, the judge was notified that a juror was feeling ill and laying down in the juror room, had Juror 2 moved to her chambers . . .—meanwhile 'confer[ing]' with counsel who 'agreed to wait'—and asked a question on behalf of |

| | |
|---|---|
| | defense counsel regarding the nature of the illness.<br>[ . . . ]<br>The judge relayed defense counsel's question about whether the illness was related to the trial, and Juror 2 responded no. ECF 9-6 at ¶¶ 15, 35, 36, 38, 41. |

The trial court did not re-state defense counsel's question on the record. Following the trial court's statement, defense counsel's objection related specifically to Juror No. 2's race and re-raised a concern about the potential pressure of being the only African-American juror on a jury. The trial court seemed to have asked the ill juror a related, but different, question. The trial court also did not say that defense counsel's question had been "relayed" to the juror. The trial court says in her postconviction order that she had asked a question "along the lines of the concern that the defense had"—but it's not clear whether the trial court asked the juror this question before or after speaking with counsel.

In her order denying Spencer's postconviction motion, the trial court does not indicate that she "relayed" defense counsel's question to the juror, but rather that she "relayed" her own question and the juror's answer back to the parties. The trial court wrote that Spencer "asserts that counsel should have had an opportunity to see the juror herself and ask multiple questions of the juror regarding the duration of her illness, whether it was longstanding or came on suddenly, etc. . . . The court had asked the juror similar questions and informed the parties of the results of its communication." ECF No. 1-1 at 6–7.

#### 4.2.3 Analysis

A petitioner cannot be granted habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Court must afford the state court substantial deference: "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In the Seventh Circuit, "§ 2254(e)(1) provides the mechanism for proving unreasonableness" under § 2254(d)(2). *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) (citing *Ward v. Sternes*, 334 F.3d 696, 703–04 (7th Cir. 2003)). "The presumption of correctness also applies to factual findings made by a state court of review based on the trial record." *Id.* (citing *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981); *Rodriguez v. Peters*, 63 F.3d 546, 554 (7th Cir. 1995); and *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). State-court factual determinations are not unreasonable "merely because [the Court] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams v. Taylor*, U.S. 529 U.S. 362, 411 (2000)). "The proper inquiry focuses instead on whether the alleged factual error is beyond debate." *Gambaiani v. Greene*, 137 F.4th 627, 632 (7th Cir. 2025). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation and alterations omitted).

For example, in *Ben-Yisrayl v. Buss*, 540 F.3d 542 (7th Cir. 2008), the state court of review made an unreasonable factual determination underlying its denial of Ben-Yisrayl's *Strickland* claim. 540 F.3d at 549–51. Ben-Yisrayl argued trial counsel had been ineffective for failing to call a witness, Fleming, to testify. *Id.* "Ben-Yisrayl was tried for the seven shootings over a span of four trials" and had been acquitted in two of the trials, where he had "presented evidence that a 'light-skinned man' matching the description of a composite sketch obtained by the police was seen in the vicinity of each of the crimes (Ben–Yisrayl describes himself as a 'dark-skinned black man')." *Id.* at 545. Ben–Yisrayl's habeas petition challenged the fourth trial where he had been convicted of murdering two brothers inside their tailor shop. *Id.* at 545–46. At trial, a witness "testified that he saw a man with a shotgun pointed at his brother at either 4:15 or 4:30." *Id.* at 549. Fleming would have testified that as he was leaving the tailor shop "at 4:10 or 4:20 p.m.," he saw a "light-skinned man" drive by who Fleming thought had a gun and who Fleming thought he recognized from composite sketches. *Id.* In analyzing *Strickland*'s prejudice prong, the state court concluded "Fleming's observations do not place anyone at the crime scene *at the time of the shooting*. Rather, Fleming places someone across the street *a half hour before* the shootings." *Id.* (emphasis added) (internal quotation omitted). However, the Seventh Circuit found this determination of fact unreasonable: the state court "determined a factual issue against the clear and convincing weight of the evidence when it found that the identification was a 'half hour before the shootings.' The testimony of . . . the brother who saw the shooter in the tailor shop, contradicts the [state court's] version of the facts." *Id.* at 549. This unreasonable "half hour"

finding impacted the reasonableness of the state court's resulting *Strickland* analysis. *See id.* at 550–51.

Here, the Majority's characterization of the sequence of events is speculative and fills in gaps in the record. But here, unlike *Ben-Yisrayl*, the record does not *contradict* the Majority's determination of the sequence of events. A fairminded jurist could infer that the decision to dismiss the juror occurred on the record because the trial court asked for objections from the parties, and the trial court was willing to alter the plan when the State identified the correct terminology under Wisconsin law. A fairminded jurist could infer that the trial court's decision to dismiss occurred contemporaneously, as she stated the conclusion on the record. Similarly, a fairminded jurist could infer that the trial court first communicated off-the-record with counsel, and then "relayed" defense counsel's question to the juror using language she felt was most appropriate. Spencer has not met his burden to rebut the presumption of correctness by clear and convincing evidence. Accordingly, the Majority did not unreasonably determine facts in light of the evidence presented in state court.

As the Court will discuss below, assuming for the sake of argument that the trial court's decision to dismiss the juror occurred during the ex parte communication, counsel's absence at that decision would not change the standard of review under federal law.

### 4.3 The Majority Did Not Decide Contrary to or Unreasonably Apply Clearly Established Federal Law When it Held that the Ex Parte Communication was not a Critical Stage

Spencer argues that the Majority incorrectly "concluded that communications between the [trial] court and an ill juror, taking place immediately before jury deliberations and resulting in the juror's dismissal

for cause, did not constitute a critical stage of the proceedings at which the right to counsel attached." ECF No. 25 at 5 (citing Wisconsin cases). Spencer asserts that he could have benefitted from counsel's assistance communicating with the ill juror, more thoroughly investigating all options, and "at the very least, to build a record." *Id.* at 6–7. Spencer adds that "[i]n this case, the court had to be especially careful about dismissing the juror because she was the one black person left on the jury." *Id.* at 8. Respondents argue the Majority correctly concluded Spencer was not denied his right to counsel at a critical stage of his prosecution. ECF No. 30 at 15–19. No clearly established Supreme Court precedent has recognized "that an *ex parte* meeting between a trial judge and an ill juror is a critical stage of a criminal proceeding for which [Spencer] had the right for counsel to be present." ECF No. 30 at 15. In his reply, Spencer shifts his challenge to the juror's dismissal. ECF No. 32 at 1. Spencer relies on *Alexander*, a Wisconsin case holding that defense counsel must be present when dismissing a potential juror at voir dire and, by analogy, concludes "defense counsel must be present whenever a juror is dismissed." *Id.* at 2.

A defendant is entitled to the assistance of counsel at all critical stages of his prosecution. *Ash*, 413 U.S. at 309–11; *United States v. Cronic*, 466 U.S. 648, 659 (1984). "The Supreme Court has not provided a concise explanation of what constitutes a critical stage." *Schmidt v. Foster*, 911 F.3d 469, 479 (7th Cir. 2018) (citing *Van v. Jones*, 475 F.3d 292, 312 (6th Cir. 2007)). Generally, a "critical stage" is a step of the proceeding that holds "significant consequences for the accused." *Woods v. Donald*, 575 U.S. 312, 315 (2015) (quoting *Bell v. Cone*, 535 U.S. 685, 696 (2002)). "[C]ourts may presume that a defendant has suffered unconstitutional prejudice if he 'is

denied counsel at a critical stage of his trial.'" *Id.* (quoting *Cronic*, 466 U.S. at 659).

In similar circumstances to the instant case, Justice Stevens wrote in concurrence,

> [T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*Rushen*, 464 U.S. at 125–26 (Stevens, J., concurring in judgment). "The U.S. Supreme Court has not identified *ex parte* communication between juror and judge as a 'critical stage' of trial. Indeed, the Supreme Court has acknowledged that the absence of defense counsel during an *ex parte* communication between a judge and a juror would not require an automatic reversal." *Blount v. Davey*, No. 16-CV-1653, 2018 WL 3912935, at *20 (E.D. Cal. Aug. 14, 2018) (unpublished) (citing *Rushen*, 464 U.S. at 114). Relying on *Rushen* among other cases, "[l]ower federal courts have consistently held that the dismissal of a juror for illness (or other cause) *and the ex parte communications leading to that dismissal* do not violate a criminal defendant's constitutional rights and/or are subject to harmless error review." *Pratt v. Ludwick*, No. 2:10-CV-10641, 2012 WL 3112411, at *15 (E.D. Mich. July 31, 2012) (emphasis added) (collecting cases).

The Majority held that the timing of the ex parte communication (before deliberations) and the substance of the ex parte communication (pertaining only to the juror's illness and ability to continue jury service) mean that this interaction was not a critical stage of the prosecution. ECF No. 9-6 at ¶ 24. Spencer has not identified clearly established federal law

that contradicts this conclusion. The Majority did not decide contrary to or unreasonably apply clearly established federal law when it held that the ex parte communication was not a critical stage of Spencer's prosecution.

The Majority did not consider whether dismissing Juror No. 2 for cause was a critical stage of the proceedings at which the right to counsel attached; instead, as discussed *supra* [cross-reference], the Majority concluded that the trial court's decision occurred with the presence of counsel. Based on the Court's research, "unrecorded ex parte communications between a trial judge and a juror are subject to harmless error review," even when that communication includes the juror's dismissal. *Olszewski v. Spencer*, 466 F.3d 47, 64–65 (1st Cir. 2006); *United States v. Evans*, 352 F.3d 65, 68–70 (2d Cir. 2003); *Pratt*, 2012 WL 3112411, at *15–17; *but see United States v. Hanno*, 21 F.3d 42, 47 (4th Cir. 1994) ("Considering that an accused has the constitutional right to be present at his jury selection, we think he has the same right to be present at the dismemberment of a jury which previously had been selected in his presence," finding, on direct appeal, that harmless error applied but record was insufficient to find harmless error. (citing *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975)). Accordingly, even if the trial court dismissed the juror during the ex parte communication, counsel's absence at that event would be reviewed for harmless error under federal law.

### 4.4 The Majority Did Not Decide Contrary to or Unreasonably Apply Clearly Established Federal Law When it Applied the Harmless Error Standard

Spencer notes that "[i]f an error is subject to harmless error analysis, the beneficiary of the error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ECF No. 25

at 7 (citing *State v. Hale*, 691 N.W.2d 637, ¶ 60 (Wis. 2005)). Respondent counters that, on habeas review, "the issue is whether the Wisconsin Supreme Court unreasonably applied clearly established federal law governing the harmless error rule." ECF No. 30 at 20 (citing *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003)). Respondent identifies that *Chapman v. California,* 386 U.S. 18, 24 (1967)) supplies the harmless error standard: a constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. "Though the court may not have cited or quoted *Chapman* in reaching its conclusion, it repeatedly cited *State v. Bjerkaas*, 472 N.W.2d 615 (Ct. App. 1991), for the applicable harmless error test. . . . In turn, *Bjerkaas* correctly employed the *Chapman* test." ECF No. 30 at 23.

### 4.4.1 The Majority's Harmless Error Analysis

The Majority noted that, although some Sixth Amendment violations may dictate a higher standard of review, "'a harmless error analysis may apply to certain violations of the Sixth Amendment right to counsel' including 'when the circuit court has had ex parte communications with the jury.'" ECF No. 9-6 at ¶ 39 (citing *Anderson* 717 N.W.2d ¶ 76, *overruled on other grounds by Alexander*, 833 N.W.2d ¶¶ 26–29). The Majority held: "Even if the judge's meeting with Juror 2 were a critical stage, any Sixth Amendment violation was harmless error." *Id.*

The Majority cited Wisconsin case *Koller*, 635 N.W.2d 838, which in turn cited *Bjerkaas*, 472 N.W.2d 615, for the standard of review: "An error is harmless if there is *no reasonable possibility* that the error affected the outcome of the trial." ECF No. 9-6 ¶ 39 (quoting *Koller* and citing *Bjerkaas*) (footnote omitted) (emphasis added). This quote the Majority selected from

*Koller* does not perfectly summarize its source material. This is the full excerpt from *Bjerkaas*:

> A constitutional error is harmless if the state can *prove beyond a reasonable doubt* that it did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 24 (1967). If there is a *reasonable possibility*, however, that the result of the trial would have been different had the error not occurred, it is prejudicial and requires reversal. *State v. Dyess*, 370 N.W.2d 222, 231–32 (1985).

472 N.W.2d ¶ 6 (emphasis added).

The Majority went on to define the specific inquiry narrowly: "whether there's a reasonable possibility that counsel's absence during the ex parte discussions affected the outcome of Spencer's trial." ECF No. 9-6 ¶ 41. To affect the outcome, first, trial counsel's presence at the meeting needed to result in Juror No. 2's retention. *Id.* The Majority looked to Juror No. 2's symptoms, and the judge's "relaying" defense counsel's question, to conclude that counsel's presence would not have impacted the juror's retention. *Id.* Second, Juror No. 2's retention would then need to affect the outcome of trial. *Id.* ¶ 42. The Majority found this unlikely as well: "The State's case was strong and there was no indication the discharged juror would have voted to acquit Spencer. Instead, the State's case shows overwhelming evidence of Spencer's guilt." *Id.* ¶ 43. The Majority then recounted the individuals aside from R.S. who testified for the state. *Id.* ¶¶ 44–46. In sum, the Majority concluded that

> There is no reason to believe counsel would have altered Juror 2's symptoms somehow or asked more probing questions enabling Juror 2 to remain on the panel. There is no reason to believe Juror 2's presence on the panel would have altered the outcome of the trial in the face of overwhelming evidence of

> Spencer's guilt and with no disruption to the deliberative process.

*Id.* ¶ 46.

#### 4.4.2 The Majority Did Not Contradict the Harmless Error Standard

On habeas review, "where, as here, the state court has conducted a harmless-error analysis, [the Court's] role is to decide whether that analysis was a reasonable application of *Chapman*." *Kamlager v. Pollard*, 715 F.3d 1010, 1016 (7th Cir. 2013) (citing *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009)). "Under *Chapman*, 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman*, 386 U.S. at 24). "If the state court reasonably applied the *Chapman* standard, 'the federal case is over and no collateral relief issues.'" *Id.* (quoting *Acevedo*, 572 F.3d at 404). "But if the state court unreasonably applied the *Chapman* standard, we must make an independent decision, applying the *Brecht* standard of 'actual prejudice' to determine whether the error was harmless." *Id.* (citing *Acevedo*, 572 F.3d at 404).

A state court decision need not cite the correct federal precedent to pass muster on habeas review. "A state court's decision is not contrary to . . . clearly established Federal law simply because the court did not cite our opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (internal quotation and citation omitted). "All that matters is that the reasoning and result of the state-court decision do not contradict federal law." *Holt v. Boughton*, 170 F.4th 1074, 1085 (7th Cir. 2026) (citation omitted). "A state court decision is 'contrary to' federal law if it applies the wrong legal standard established by Supreme Court precedent." *Kamlager*, 715 F.3d at 1015 (citing *Bell v. Cone*,

535 U.S. 685, 694 (2002)); *Dansberry v. Pfister*, 801 F.3d 863, 868–69 (7th Cir. 2015) (state court concluded an error was harmless but applied the wrong standard by requiring defendant to show he was denied "real justice" or suffered "prejudice") (citing *Acevedo*, 572 F.3d at 404 and *Ruhl v. Hardy*, 743 F.3d 1083, 1091 (7th Cir. 2014)).

In *Jewell v. Hepp*, the state trial court wrote a correct response to a jury question without consulting the defendant. *Jewell v. Hepp*, No. 19-CV-658-PP, 2022 WL 9398832, at *2 (E.D. Wis. Oct. 14, 2022), *aff'd sub. nom. Jewell v. Boughton*, 90 F.4th 1199 (7th Cir. 2024). The defendant argued the "written communication . . . deprived him of his right to be present under Fifth, Sixth, and Fourteenth Amendments." *Id.* at *6. On habeas review, Chief Judge Pepper concluded that the Wisconsin appellate court had not decided contrary to the *Chapman* harmless error standard, although the state court had not correctly articulated that standard. *Id.* at *14–15. In *Jewell*, the state appellate court had cited Wisconsin precedent with different language than *Chapman*: "The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction." *Id.* (citations and quotations omitted). The appellate court "referenced other Wisconsin cases holding that the standard it applied is akin to the *Chapman* standard." *Id.* at *15. Accordingly, although the appellate court "did not mention the Chapman harmless-beyond-a-reasonable-doubt standard and did not use the words 'harmless error beyond a reasonable doubt,'" it did cite cases that incorporated the *Chapman* standard, therefore "the Wisconsin Court of Appeals applied the Chapman standard." *Id.* at *15; *Holt*, 170 F.4th at 1085 ("[W]hile the Wisconsin Court of Appeals didn't cite or discuss federal law on the intersection of the complete defense right and evidentiary rules, it didn't need to. All that matters is that the reasoning and result of the state-

court decision do not contradict federal law." (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Here, the Majority asked whether "there's *a reasonable possibility* that counsel's absence during the ex parte discussions affected the outcome of Spencer's trial." ECF No. 9-6 at ¶ 41. The correct articulation under *Chapman* is whether the State can prove beyond a reasonable doubt that counsel's absence during the ex parte discussion did not contribute to the verdict obtained. As in *Jewell*, the Majority cited a state-law analogue to *Chapman* but did not cite *Chapman* or articulate the State's burden to prove beyond a reasonable doubt that the error was harmless. The failure to articulate this State's burden may have allowed the Majority to fill gaps in the record with inferences in the State's favor.

In *Chapman*, the Supreme Court found "little, if any difference" between the language the Majority employed here ("no reasonable possibility") and the *Chapman* harmless error standard. "There is little, if any, difference between our statement . . . about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963)); *United States v. Reed*, 392 F.2d 865, 868 (7th Cir. 1968) ("[T]here isn't much difference between the 'no reasonable possibility' test of *Fahy* and 'harmless beyond a reasonable doubt.'"); *see also Brown v. Davenport*, 596 U.S. 118, 157 (2022) (Kagan, J., dissenting) ("Applying AEDPA, the court asks whether the state court acted 'unreasonabl[y]' in finding (under *Chapman*) that the error was harmless beyond a reasonable doubt—meaning that there is no

'reasonable possibility' it 'might have contributed to the conviction.'" (citing 28 U.S.C. § 2254(d) and *Chapman*, 386 U.S. at 23–24)).

Although it did not cite *Chapman* or articulate the burden, the Wisconsin cases the Majority cited incorporated *Chapman*. Accordingly, here as in *Jewell*, the Majority did not decide contrary to clearly established federal law.

### 4.4.3 The Majority Did Not Unreasonably Apply the Harmless Error Standard

The Court next considers the Majority's application of the harmless error standard. Broadly, the Majority provided two rationales for its conclusion that the trial court's error was harmless: first, counsel's presence could not have impacted Juror No. 2's retention; and second, Juror No. 2's retention would not impact the outcome of the trial because of the strength of the state's case.

Harmless error review is not a test of the state's evidence. "Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). "The question is not whether the legally admitted evidence was sufficient, but rather whether the State proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Jewell*, 90 F.4th at 1204 (citing *Chapman*, 386 U.S. at 24 and *Jensen*, 800 F.3d at 902).

As discussed supra in section 4.4.2, "[l]ower federal courts have consistently held that the dismissal of a juror for illness (or other cause) and the ex parte communications leading to that dismissal do not violate a criminal defendant's constitutional rights and/or are subject to harmless

error review." *Pratt*, 2012 WL 3112411, at *17 (collecting cases). The Seventh Circuit has found ex parte communication leading to a juror's dismissal harmless when,

> [C]ounsel was aware of the possible substitution the day before it occurred and did not object. . . .[T]he petitioner was present during voir dire and the empaneling of the jurors and the alternate jurors[, t]he alternate juror was sworn in with the other jurors before the presentation of the evidence, was present throughout trial, and was present during jury deliberations but did not participate until the substitution."

*Williams v. Parke*, 133 F.3d 971, 974 (7th Cir. 1997).

Here, the Majority's first rationale appropriately asked whether counsel's presence could have impacted the ill juror's retention, considering juror's symptoms and the trial court's statements about the court's perspective and about the juror's condition. *See Pratt*, 2012 WL 3112411, at *17 ("In addressing the mistrial motion, the trial judge clearly stated that he dismissed the extra juror due to illness, that he intended to proceed with 13 jurors, and that nothing the parties could have said would have changed his plan."). The first rationale analyzed the correct factors in this context.

However, in the Majority's second rationale, it posited that "there was no indication the discharged juror would have voted to acquit Spencer." Even if the communication about Juror No. 2's illness had occurred with counsel present, it's not clear how Juror No. 2's inclinations about Spencer's guilt or innocence would be at all indicated in the record absent additional fact-finding. Then, the Majority considered testimony from T.M.'s sisters and Towns, and other evidence corroborating that gunshots had been fired, to conclude that Juror No. 2's presence on the jury would not have altered the outcome of the trial "in the face of

overwhelming evidence of Spencer's guilt." The Majority's second rationale analyzed whether the legally admitted evidence was sufficient to support a verdict, instead of focusing on whether the constitutional error complained of contributed to the verdict obtained. The second rationale unreasonably applied *Chapman*.

"If this case was on direct appeal, it could . . . present a close call." *Jewell*, 90 F.4th at 1205; *see United States v. Gay*, 522 F.2d 429 (6th Cir. 1975) (finding record insufficient to declare ex parte communication error harmless on direct appeal); *United States v. Hanno*, 21 F.3d 42, 48 (4th Cir. 1994) (same). "But we are not on direct appeal. . . . A close call on which there is room for fairminded disagreement will not suffice." *Jewell*, 90 F.4th at 1205. The Majority's first rationale was sound, and fairminded jurists could disagree about whether the Majority needed to opine on the strength of the state's case to speculate about how Juror No. 2 would have impacted deliberations. Accordingly, the Majority did not unreasonably apply the harmless error standard, and habeas relief is not warranted.

### 4.5 The Majority Did Not Decide Contrary to Clearly Established Federal Law When it Applied *Strickland*

Finally, Spencer asserts that trial counsel was ineffective for failing to object to hearsay testimony. ECF No. 25 at 10. At trial, R.S. testified that McKinney told R.S. that McKinney fired a gun from the residence in attempting to protect R.S.; Spencer argues this statement constitutes hearsay, and the state relied on it as key evidence. *Id.* The Majority assumed that trial counsel's failure to object was deficient performance but that it did not prejudice Spencer in light of the overwhelming evidence of guilt. *Id.* at 11. Respondent asserts that the Majority reasonably applied *Strickland*, and

habeas review is doubly deferential towards counsel's performance and the state court's evaluation of that performance. ECF No. 30 at 26, 28–29.

To prevail on a claim of ineffective assistance of counsel, Spencer must show that (1) his counsel's performance was deficient, falling below an objective standard of reasonableness, and (2) that deficient performance caused him prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–89, 691–92 (1984). Spencer's claim fails if "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 89 (2011). "[F]ederal courts should deny a habeas corpus petition so long as the state court took the constitutional standard 'seriously and produce[d] an answer within the range of defensible positions.'" *Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012) (quoting *Mendiola v. Schomig*, 224 F.3d 589, 591–92 (7th Cir. 2000); citing *Simpson v. Battaglia*, 458 F.3d 585, 592 (7th Cir. 2006) and *Harrington*, 562 U.S. at 105).

On this point, the Court agrees with the Respondent:

> [T]he jury would have naturally inferred from . . . non-hearsay evidence that McKinney or someone else in R.S.'s apartment saw the robbery and, recognizing R.S. was fleeing for his life from an active shooter, decided to return fire to protect him. The jury did not need to know who that shooter was to convict Spencer of felony murder; it only needed to be convinced the robbery Spencer committed seconds earlier was a substantial factor in producing T.M.'s death.

ECF No. 30 at 28–29. Other, non-hearsay evidence had established that R.S. lived in the residence with McKinney and Green-Brown, investigators testified that they believed bullet casings came from two different firearms, and investigators testified that they believed shots came from the residence. Accordingly, the Majority did not unreasonably apply *Strickland* in

concluding that Spencer was not prejudiced by trial counsel's failure to object to this statement by R.S.

**5. CONCLUSION**

For the reasons stated herein, Spencer's petition for a writ of habeas corpus will be denied and this case will be dismissed with prejudice.

Rule 11 of the Rules Governing Section 2254 Cases requires the Court to either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11 of the Rules Governing Section 2254 Cases. Such a certificate should only be issued where the petitioner has made a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted).

Here, Spencer has established that reasonable jurists could debate whether the petition should have been resolved in a different manner. Specifically, reasonable jurists could debate these issues:

Did the Supreme Court of Wisconsin unreasonably determine facts in light of the evidence presented in state court?

Did the Supreme Court of Wisconsin decide contrary to or unreasonably apply clearly established federal law when it applied the *Chapman* harmless error standard?

Accordingly,

**IT IS ORDERED** that Petitioner Robert Darius Spencer's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 1, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to Petitioner Robert Darius Spencer's petition be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge